UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

CHARLES MOODY and ANTHONY IRONS,

BIANCO, J.

                                     Plaintiff,

**COMPLAINT**

                              -against-

Jury Trial Demanded

ECF Case

CITY OF NEW YORK; and JOHN and JANE DOE 1
through 10, individually and in their official capacities
(the names John and Jane Doe being fictitious, as the true
names are presently unknown),

BROWN, M. J.

                                     Defendants.

-----------------------------------------------------------------------x

Plaintiffs, CHARLES MOODY and ANTHONY IRONS, by their attorney Katherine E.
Smith, complaining of the defendants, respectfully alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action for compensatory damages, punitive damages and
attorneys' fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for violations of their civil
rights, by defendants THE CITY OF NEW YORK, and Police Officer and P.O.s "JOHN and
JANE DOE" #1-10, as said rights are secured by said statutes and the Constitutions of the State
of New York and the United States.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth
and Fourteenth Amendments to the Constitution of the United States.

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and
1367(a).

4.      This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c), as the incidents alleged herein occurred in this district.

## JURY DEMAND

6.      Plaintiffs demand a trial by jury in this action.

## PARTIES

7.      Plaintiffs CHARLES MOODY and ANTHONY IRONS are residents of Kings County in the City and State of New York.

8.      Defendant City of New York ("City") is a municipal corporation organized under the laws of the State of New York.

9.      Defendant City, maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of defendant City. The NYPD is responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10.     At all times relevant defendants John and Jane Doe 1 through 10 ("Doe Defendants") were police officers, detectives or supervisors employed by the NYPD. Plaintiffs do not know the real names and shield numbers of defendants John and Jane Doe 1 through 10.

11.     At all times hereinafter mentioned the Doe Defendants (collectively the "Municipal Defendants"), either personally or through their employees, were acting under color

of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

12.     Each and all of the acts of the Municipal Defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant City of New York.

13.     Each and all of the acts of the Municipal Defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant City of New York.

## STATEMENT OF FACTS

14.     On or about 8:00 p.m. on March 15, 2013, plaintiffs were lawfully within the vicinity of Popeye's restaurant located at 695 Rockaway Ave., Brooklyn, New York.

15.     Plaintiffs observed several unidentified New York City Police Officer arresting an individual unknown to them.

16.     Plaintiffs remarked to each other that the officers appeared to be treating the individual unfairly.

17.     The officers then approached plaintiffs and unlawfully stopped and searched them.  The officers recovered nothing illegal from plaintiffs.

18.     Despite the fact that they had no probable cause to believe that they had committed any crimes or offenses, the officers placed plaintiffs into handcuffs and under arrest.

19.     The officers transported plaintiffs to a police precinct.

20.     At the precinct the officers falsely informed employees of the Kings County District Attorney's Office that they had observed plaintiffs commit the following crimes/offenses: Obstruction of Governmental Administration and Disorderly Conduct.

21.    Plaintiffs were subsequently transported to Central Booking.

22.    Prior to arraignment, the Distinct Attorney's Office declined to prosecute the case.

23.    Plaintiffs were released after spending approximately 18 hours in custody.

24.    Plaintiffs suffered damage as a result of defendants' actions.  Plaintiffs were deprived of their liberty, suffered emotional distress, mental anguish, fear, pain, bodily injury, anxiety, embarrassment, humiliation, and damage to their reputation.

### NOTICE OF CLAIM

25.    Within ninety days after the claim alleged in this Complaint arose, a written notice of claim with respect to plaintiff Moody was served upon defendants at the Comptroller's Office.

26.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

27.    This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

### FIRST CLAIM
### 42 U.S.C. § 1983  Federal Civil Rights Violations

28.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

29.    All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

30.    All of the aforementioned acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and

Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

31.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

32.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

33.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of their respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CLAIM
### Unlawful Stop and Search

34.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

35.     Defendants violated the Fourth and Fourteenth Amendments because they stopped and searched plaintiffs without reasonable suspicion.

36.     As a direct and proximate result of this unlawful conduct, plaintiffs sustained the damages herein before alleged.

## THIRD CLAIM
### False Arrest

37.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

38.     The Municipal Defendants violated the Fourth and Fourteenth Amendments because they arrested plaintiffs without probable cause, privilege or consent.

39.     As a direct and proximate result of this unlawful conduct, plaintiffs' liberty was restricted for an extended period of time, they was put in fear for their safety, humiliated and subjected to handcuffing, and other physical restraints, without probable cause, in addition to the damages hereinbefore alleged.

### FOURTH CLAIM
### State Law False Imprisonment and False Arrest

40.     Plaintiff Moody repeats and realleges each and every allegation as if fully set forth herein.

41.     By their conduct, as described herein, the individual defendants are liable to plaintiffs for falsely imprisoning and falsely arresting them.

42.     Plaintiff was conscious of his confinement.

43.     Plaintiff did not consent to his confinement.

44.     Plaintiff's confinement was not otherwise privileged.

45.     Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

46.     As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

### FIFTH CLAIM
### Negligent Hiring/Training/Retention

47.     Plaintiff Moody repeats and realleges each and every allegation as if fully set forth herein.

48.     Defendant City, through the NYPD, owed a duty of care to plaintiffs to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiffs or to those in a like situation would probably result from the foregoing conduct.

49.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

50.     Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

51.     Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiffs' injuries.

52.     As a direct and proximate result of this unlawful conduct, plaintiffs sustained the damages hereinbefore alleged.

## SIXTH CLAIM
### Malicious Abuse of Process

56.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

57.     The individual defendants issued legal process to place plaintiffs under arrest.

58.     The Municipal Defendants arrested plaintiffs in order to obtain collateral objectives outside the legitimate ends of the legal process.

59.     The Municipal Defendants acted with intent to do harm to plaintiffs without excuse or justification.

60.     As a direct and proximate result of this unlawful conduct, plaintiffs sustained, *inter alia*, loss of liberty, loss of earnings, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of their constitutional rights, in addition to the damages hereinbefore alleged.

### SEVENTH CLAIM
### Denial Of Constitutional Right To Fair Trial

61.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

62.     The individual defendants created false evidence against Plaintiffs.

63.     The individual defendants forwarded false evidence to prosecutors in the Kings County District Attorney's office.

64.     In creating false evidence against Plaintiffs, and in forwarding false information to prosecutors, the individual defendants violated Plaintiffs' constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

65.     As a direct and proximate result of this unlawful conduct, plaintiffs sustained the damages hereinbefore alleged.

### EIGHTH CLAIM
### Failure To Intervene

66.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

67.     Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

68.     Accordingly, the defendants who failed to intervene violated the First, Fourth, Fifth And Fourteenth Amendments.

69.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

### NINTH CLAIM
### Monell Claim

70.     The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

71.     The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

72.     At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to

deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part infra, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

      73.    The existence of aforesaid unconstitutional customs and policies may be inferred from **repeated occurrences of similar wrongful conduct**, as documented by the following civil rights actions and parallel prosecutions of police officers:

    a.   Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y)(police officer who exposed a precinct's polices and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

    b.   Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

    c.   Taylor-Mickens v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

    d.   Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

    e.   Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issue were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

              'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police

officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

f.   People v. Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g.   Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h.   Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i.   MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j.  McMillan v. City of New York, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.  Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

l.  Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m.  Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y.)(police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n.  Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o.  Richardson v. City of New York, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p.  Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

74.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a.   The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[1]
>
> {...}
>
> What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world.   Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets.  This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

b.   In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a

---

[1] The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), p.40, July 7, 1994.

[2] Mollen Commission Report, pp 41.

[3] Melissa Grace, NYPD Sergeant William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal, Daily News, June 27, 2011,

picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

   c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released.[4] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

   d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Kings County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the

[3] Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288
[4] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.
[5] Id.

Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e.  In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources.

> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

> To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting...

> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

> The officers were indicted for felony perjury, filing a false report and filing a false instrument.[7]

f.  In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was

---

[6] John Marzulli, *Claims of Corruption in Kings Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-Kings-precinct-put-crooked-sentencing-hold-article-1.296352.

[7] Edward Demarche, *Two cops arraigned for framing 'undercover cop,'* N.Y. Post July 20, 2010, available at http://nypost.com/2010/07/30/two-cops-arraigned-for-framing-undercover-cop/.

previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[8]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand · jury investigations – in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[9]

75.  Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[10]

b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[11]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses"

[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News Jan. 7, 2010, available at http://www.nydailynews.com/new-york/city-shells-35g-grandmother-monica-gonzalez-busted-hooker-article-1.459661 9 [I could not find a source for this one. – Tim ]

[10] Jim Hoffer, NYPD Officer claims pressure to make arrests WABC ·TV Eyewitness News, March 2, 2010, available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[11] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas*, N.Y. Daily News, March 3, 2011.

per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then."[12]

d.   The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring. [13]

e.   Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas. [14]

f.   In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[15]

g.   In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[16]

---

[12] See Hoffer, supra note 10.

[13] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.

[14] Tom Namako and Kirsten Fleming, Nightime Riders in Big Sit Fit, The New York Post. December 26, 2009, available at http://www.nypost.com/p/news/11/space_hogs_lapped_on_empty_subways. [This link no longer works, could not find source. – TP]

[15] Rocco Parascandola, Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648.

[16] Rocco Parascandola, Deputy Chief Michael Marino threatens cops at the 79'h Precinct who want to go on summons strike, N.Y. Daily News, Dec. 15, 2010, available at http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513.

h.    Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct, testified
      in a civil matter before a Brooklyn Supreme Court jury that officers are likely to
      get poor performance ratings if they have few arrests, conceding that arrest
      numbers are a factor in evaluating an officer's performance.[17] Ultimately, the jury
      in that case judged that the police and a policy "regarding the number of arrests
      officers were to make that violated plaintiffs constitutional rights and contributed
      to her arrest."[18]

i.    The New York City Office of Collective Bargaining concluded that officers in
      Brooklyn's 75th Precinct were required to issue four parking tickets, three moving
      violation citations; three "quality-of-life" summonses, make one arrest and two
      stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the
      NYPD maintained an illegal "summons quota for traffic violations in the precinct
      and by penalizing officers for failing to meet the stated number of traffic
      citations." She ordered the city to cease and desist from the practice.[19]

j.    Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the
      northern Bronx, was investigated for ordering officers to make a certain number
      of arrests each month. According to The New York Daily News:

           The incident allegedly occurred in the spring when Creighton ordered at
           least eight members of an undercover anti-crime team to a meeting in
           Pelham Bay Park to berate them about an alleged lack of arrests, sources
           said.

           'You can't make the nine collars a month, then we'll all have to go our
           separate ways," Creighton told the officers, according to an internal
           complaint obtained by The News. Anything less than nine arrests would
           be a "personal slap in the face," Creighton allegedly said.

           Creighton then told the cops to finagle the times of arrests so any overtime
           was paid for by a federally funded anti-drug program, the complaint states.

           Unbeknownst to Creighton, one officer had his NYPD radio switched on
           so the captain's 10 to 12 minute speech was broadcast to Bronx precincts
           in Morrisania and Schuylerville and taped by the 911 dispatcher.[20]

---

[17] William J. Gorta, *Brooklyn Mom's Suit, Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,.2011, at 6, available on
Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15,
2011, at 20, also available on Westlaw at 20 WLNR 2986205. [Could not find this WL cite. – TP]
[18] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19,
2011, available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-
settles-75-000-article-1.134856.
[19] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at
http://www.thenewspaper.com/news/09/914.asp; *see also,* Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas-
Agents Often Caught Citing You For Violations You Didn't Commit,* WCBSTV.com, August 14, 2007, available atCould not
find this cite. - http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html. [Could not find this cite. – TP]

[20] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing,* The New York Daily News, November 14, 2007,
available at http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-
1.256006.

76.     The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, inter alia, by the following:

a.      In Floyd v. City of New York, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013), the plaintiffs brought a § 1983 action alleging that their Fourth and Fourteenth Amendment Rights were violated when they were stopped pursuant to New York City's stop and frisk policy. The court cited a 1999 investigation by the Attorney General finding that NYPD officers were conducting "unjustified stops and frisks" as evidence of the NYPD's awareness of its widespread violation of constitutional rights.[21] Despite this notice, the NYPD actually "[increased] its stop activity by roughly 700%" between 2002 and 2011 by "pressuring commanders … [who], in turn, pressured mid-level managers and line officers to increase stop activity by rewarding high stoppers and denigrating or punishing those with lower numbers of stops."[22] In addition to noting several inadequacies in the NYPD training materials, the court found that "[t]he gravest problems in the NYPD's stop and frisk practices stem from … the 'operational policy' carried out in the streets" wherein evidence of unconstitutional stops is denied as inaccurate and offending officers are not meaningfully disciplined or monitored to prevent future misconduct.[23] Indeed, the NYPD was found to be unable to correct unconstitutional practices or even identify constitutional violations.[24] Ultimately, the court found that the NYPD "violated § 1983 through their deliberate indifference to unconstitutional stops, frisks, and searches" and that "such stops [established] Monell liability based on 'practices so persistent and widespread as to practically have the force of law.'"[25]

b.      With respect to Fourth Amendment violations, in Ligon v. City of New York, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[26] Judge Scheindlin specifically rejected the NYPD's

---

[21] Floyd, 2013 WL 4046209, at *24. See also The New York City Police Department's Stop & Frisk Practices (1999) (available at http://128.121.13.244/awweb/main.jsp?flag=browse&smd=1&awdid=1).

[22] Floyd, 2013 WL 4046209, at *24, 26.

[23] Id. at *40, 43.

[24] Id. at *40.

[25] Id. at *70-71.

[26] Id. at *34.

argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

c.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[27]

d.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

e.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[28]

f.  In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months

---

[27] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[28] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[29]

g.  Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[30]  When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s).  Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[31]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by he NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[32]

77.  The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

---

[29] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements*, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

[30] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[31] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.

[32] *Christopher Dunn & Donna Lieberman, City Leaders Must Get Serious About Policing the Police*, Daily News, August 20, 2008.

a.  In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[33]

b.  In <u>Griffin v. City of New York</u>, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.[34]

c.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

d.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the  "code of silence" in the NYPD;

e.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way. "The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Kelly.

78.  The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.   They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official

---

[33] Al Baker, *Bronx Police Precinct Accused of Using Quota System*, N.Y. Times, Feb. 24, 2012, available at

http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.
[34] Id at 389-92. <u>See also</u> Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

79.     All of the foregoing acts by defendants deprived Plaintiffs of their federally protected rights, including, but limited to, the constitutional rights enumerated herein.

80.     Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

81.     Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

82.     Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects

of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

83.     The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest Plaintiffs without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiffs' constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiffs' rights.

84.     Plaintiffs' injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

85.     As a result of the foregoing, Plaintiffs were deprived of their liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.


DATED:      New York, New York
            October 4, 2013


                                    Katherine E. Smith
                                    495 Henry Street, #159
                                    Brooklyn, NY  11231
                                    katiesmithnylaw@gmail.com
                                    347-470-3707

                                    *Attorney for plaintiffs*

<u>RELEASE PURSUANT TO C.P.L. 160.50</u>

I, *Anthony Irons*_____, pursuant to CPL § 160.50[1][d], hereby designate the Corporation Counsel of the City of New York, or his authorized representative, as my agent to whom records of the criminal action terminated in my favor entitled <u>People of the State of New York</u> v. *Anthony Irons*___, Docket _____ in Criminal Court, *Kings* County, State of New York, relating to my arrest on or about *3/5/13*___.

I understand that until now the aforesaid records have been sealed pursuant to CPL §160.50, which permits those records to be made available only (1) to persons designated by me, or (2) to certain other parties specifically designated in that statute.

I further understand that the person designated by me above as a person to whom the records may be made available is not bound by the statutory sealing requirements of CPL § 160.50.

The records to be made available to the persons designated above comprise all records and papers relating to my arrest and prosecution in the criminal action identified herein on file with any court, police agency, prosecutor's office or state or local agency that were *ordered to be sealed under* the provisions of CPL § 160.50.

X *Anthony Irons*
SSN: *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*
DOB: *11/12/1982*

On the *18th Sept*, before me personally came and appeared *Anthony Irons*, to me known and known to me to be the individual described in and who executed the foregoing instrument, and who duly acknowledged to me that he executed the same.

Notary Public

ROBERT J. MARINELLI
NOTARY PUBLIC-STATE OF NEW YORK
No. 02MA6220272
Qualified in New York County
My Commission Expires April 12, 2014

<u>RELEASE PURSUANT TO C.P.L. 160.50</u>

I, Charles Moody, pursuant to CPL § 160.50[1][d], hereby designate the Corporation Counsel of the City of New York, or his authorized representative, as my agent to whom records of the criminal action terminated in my favor entitled <u>People of the State of New York v. Charles Moody,</u> _____ in Criminal Court, Kings County, State of New York, relating to my arrest on or about   3/15/2013  .

I understand that until now the aforesaid records have been sealed pursuant to CPL §160.50, which permits those records to be made available only (1) to persons designated by me, or (2) to certain other parties specifically designated in that statute.

I further understand that the person designated by me above as a person to whom the records may be made available is not bound by the statutory sealing requirements of CPL § 160.50.

The records to be made available to the persons designated above comprise all records and papers relating to my arrest and prosecution in the criminal action identified herein on file with any court, police agency, prosecutor's office or state or local agency that were ordered to be sealed under the provisions of CPL § 160.50.

X Charles Moody
Charles Moody
SSN: 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
DOB: 2/22/83

On 9/18/13, before me personally came and appeared Charles Moody, to me known and known to me to be the individual described in and who executed the foregoing instrument, and who duly acknowledged to me that he executed the same.

Notary Public

ROBERT J. MARINELLI
NOTARY PUBLIC-STATE OF NEW YORK
No. 02MA6220272
Qualified in New York County
My Commission Expires April 12, 2014